JUDGE KOELTL

11 CIV 8710

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

WILLIAM GUTIERREZ,

                Gutierrez,

      -against-

CITY OF NEW YORK, THE NEW YORK CITY POLICE
DEPARTMENT and MATHEW HYLAND and RICK
MILLER in their Individual and Official Capacities,

                Defendants.

-------------------------------------------------------------------------X

RECEIVED

NOV 3 0 2011

U.S.D.N.
CASHIERS

**COMPLAINT**

**JURY TRIAL DEMANDED**

    WILLIAM GUTIERREZ ("Gutierrez"), by his attorney, Joady Benjamin Feiner,

Attorney at Law, complaining of the Defendants, CITY OF NEW YORK ("City"), THE

NEW YORK CITY POLICE DEPARTMENT ("NYPD") and DEPUTY INSPECTOR

MATTHEW HYLAND ("Hyland"), Individually and in his Official Capacity, and

INSPECTOR RICHARD MILLER ("Miller"), Individually and in his Official Capacity,

alleges upon knowledge as to himself and his own actions and upon information and

belief as to all other matters as follows:

## NATURE OF THE CLAIM

    1. This is a civil action seeking monetary damages to remedy racial and national

origin discrimination in public employment and redress the violation and deprivation of

rights secured by Gutierrez pursuant to 42 U.S.C. §2000 *et seq*. (vis-à-vis violations of

Title VII of the Civil Rights Act of 1964, as amended) ("Title VII"); 42 U.S.C. §1981, 42

U.S.C. §983, the First and Fourteenth Amendments of the United States Constitution, the

New York State Human Rights Law, Executive Law Section § 290 *et seq*. ("NYSHRL"),

the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York §101 et seq. ("NYCHRL"), as well as Intentional Infliction of Emotional Distress and any other cause(s) of action that can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343 and the aforementioned statutory provisions. The court has jurisdiction over the state law claim under the doctrine of pendent and or supplemental jurisdiction 28 U.S.C. §1367 (a).

3. Venue is appropriate in this court as all actions comprising the claims for relief occurred within this judicial district and pursuant to 28 U.S.C. §1391 because one (1) or more of the defendants resides within this judicial district.

## PROCEDURAL REQUIREMENTS

4. All jurisdictional conditions precedent to maintaining this action have been fulfilled.

5. Gutierrez filed an "Amended Charge of Discrimination" against Defendants based on disability, gender discrimination, and retaliation with the Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No.: 520-2010-03419, which was cross-filed with the New York State Division of Human Rights, on or about December 20, 2010.

6. By letter dated September 23, 2011, the EEOC issued a Notice of Right to Sue.

7. Gutierrez filed and served a "Notice of Claim" on the City dated December 17, 2010.

8. More than 30 days have elapsed since Gutierrez filed the aforementioned "Notice of Claim" and the City has failed, neglected, or refused to make any adjustment of pay such claim.

9. The instant action was timely filed within 90 days of receiving the "Notice of Right to Sue" from the EEOC.

**PARTIES**

8. At all relevant times herein, Gutierrez was and is a resident of Bronx County, State of New York.

9. At all relevant times herein, NYPD is a department of the City and is an employer and/or an agent of an employer within the meaning of 42 U.S.C. § 2000 *et seq.* whose principal offices are located at One Police Plaza, New York, NY 10038.

10. Hyland and Miller, both white males, served as Gutierrez's supervisors from approximately April 2010 to approximately December 17, 2010.

11. Gutierrez is an employee and a qualified person as defined by Title VII, the NYSHRL and the NYCHRL.

12. NYPD is an employer that employs more than 15 employees within the meaning of Title VII, the NYSHRL and the NYCHRL.

**STATEMENT OF THE FACTS**

1. Guttierrez was sworn in as a Police Officer on February 28, 1994, promoted to Sergeant on May 1, 2000, promoted to Lieutenant on June 26, 2005 and promoted to Captain on September 28, 2008.

2. Guttierrez was initially assigned as Captain to the fifth precinct.

3. In or about March of 2009, Gutierrez interviewed for the position of Captain at NYPD's Internal Affairs Bureau (IAB).

4. On or about April 13, 2010, Gutierrez was assigned to an IAB Captain's position and informed that he would be in charge of the Field Service Division ("FSD") group 41 B, team 3, covering Brooklyn North and South, Queens and Staten Island.

5. Gutierrez replaced Hyland, who was promoted to Deputy Inspector and became Gutierrez's direct supervisor.

6. The Captain's position in IAB is a fast track promotional position: the previous six (6) officers who held Gutierrez's position were all promoted in a short amount of time to desirable higher-paying positions. All of these officers are white males.

7. Before he started the new position, Gutierrez received several phone calls from Lieutenant Edward Rodriguez ("Rodriguez"), who had worked in group 41 B team 3, under Hyland.

8. Rodriguez warned Gutierrez that senior white officers were unhappy with his promotion and were asking questions such as: "who is this Spanish Captain?" and "who is his hook?"

9. Rodriguez also told him that the senior white ranking officers had asked him if he knew Gutierrez because "you are both Dominican."

10. In late April, 2010, Gutierrez placed a courtesy call to Hyland to introduce himself, at which time Hyland demanded to know the identity of Gutierrez's "hook".

11. Gutierrez told Hyland that he did not have a "hook."

12. On or about May 5, 2010, Gutierrez started his position with IAB.

13. Gutierrez met with his supervisor Hyland and inquired as to when he would take

the 3-week investigative course ordinarily required of all incoming IAB Captains.

14. Although Gutierrez had no previous experience working in an investigative unit, Hyland summarily denied Gutierrez the training, stating only "You don't need it."

15. The same day, an officer in the unit, Detective Glen ("Glen") (black male), asked Gutierrez whether Hyland also failed to provide Gutierrez the required computer passwords and codes.

16. Gutierrez informed Glen he had not received the passwords or codes from Hyland, to which Glenn responded, in sum and substance "Watch your back because I heard they don't want you here and they are going to fuck with you. It's part of their plan to show you are incompetent."

17. Around the same time, Hyland gratuitously provided Gutierrez with the "inside scoop" on the black and Hispanic officers under Gutierrez's supervision: Sergeant Howard, a black male, was of "retard intelligence"; Sergeant Berenten, a black female, was a "Bimbo, the only reason she is in the unit is because we did a 'favor' for Detective Diaz"; and Sergeant Loreano, a Puerto Rican male, Sergeant Ramirez, a Dominican male, and Detective Glen were all "fucking scammers" who needed to be "watched."

18. In contrast, Hyland stated the teams comprised of predominantly white, male officers were "good teams."

19. Also around the same time, Hyland removed Gutiettez's office chair, stating "that chair is not yours," and gave it to Sergeant Chris Daley, a white male.

20. Gutierrez learned from Detective Raphael Diaz ("Diaz'), the administrative coordinator for group 41 in charge of vehicle maintenance and administrative functions, that the chair had been in the office of Captain Salerno, the previous occupant who had

retired, and was an "executive chair" that should not have been given to an officer two ranks below Gutierrez.

21. Diaz also warned Gutierrez to "watch out," because he had heard that Hyland was not happy about having a Dominican as a Captain at IAB.

22. Later that day, as Gutierrez, Sergeant Ramirez, Detective Diaz and Lieutenant Rodriguez were conferring, Hyland passed by and said "The FSD looks like the major leagues," apparently referring to the large number of Dominicans playing major league baseball.

23. Hyland entered Gutierrez's office on several occasions thereafter and derogatorily stated "I feel like I'm in the Heights with your merengue music playing."

24. On or about June 3, 2010, Hyland attempted to coerce one of Gutierrez's investigating officers (a white male) to make false allegations against a black male officer who was the target of an investigation by IAB that had been completed at least a year prior to Gutierrez's assignment to IAB.

25. Hyland ordered Gutierrez, along with the investigating officer, to go to the Assistant District Attorney ("ADA") and have charges filed against the black officer.

26. After the ADA determined that there was no merit to the allegations and refused to file charges, Hyland accused Gutierrez and his investigator of attempting to protect the target of the investigation.

27. Hyland told Gutierrez to "fuck with" the investigating officer until he "properly" presented the charges to the ADA.

28.    On or about June 9, 2010, Diaz informed Gutierrez that IAB had received a new vehicle for him, and, as per IAB policy, Gutierrez was entitled to assign the vehicle he

was currently driving to one of his officers.

29.    Gutierrez chose to assign the vehicle to Sergeant Chris Castle, a white male, who was one of Gutierrez's best investigators.

30.    Diaz called Gutierrez back later in the day to inform him that Hyland ordered him to give the new car to Sergeant Daley, a white male, who was two ranks below Gutierrez.

31.    Diaz said he inquired as to why Hyland was breaking with IAB custom and policy and giving the new vehicle to a lower ranking officer rather than Hyland, to which Hyland replied "fuck him, he doesn't deserve it" because "he lives in the boogie down Bronx."

32. Gutierrez filed a complaint with police headquarters in response to Hyland's assignment of the new vehicle to a lower ranking officer. Although headquarters never made an official determination, a mandate was issued removing all vehicles issued to officers ranked lower than Sergeant at IAB.

33. "Steering" meetings are held approximately every two months, at which all IAB Captains provide status updates to the Chiefs regarding their units' investigations over the past quarter.

34. To prepare for the meetings, each Captain is provided with packet of information containing the specifics of all the cases the Captain's unit has been working on ("steering report").

35. Hyland withheld Gutierrez's steering report before the meeting scheduled for mid-June 2010.

36. As a newly assigned Captain, Gutierrez should have been informed of the process and procedures for the steering meeting by Hyland, his immediate supervisor.

37. Upon learning Hyland had withheld the information from Gutierrez, Lieutenant Rodriguez retrieved the steering reports for Gutierrez and told him that Hyland was withholding the information so that Gutierrez would look bad in front of the Chiefs.

38. Before the scheduled steering meeting began, Hyland acted surprised that Gutierrez had the steering reports and demanded to know how Gutierrez obtained them.

39. Gutierrez received praise from the Chiefs for his presentation at the steering meeting, despite the obstacles that Gutierrez had faced, including but not limited to: 1) being in the position of Captain at IAB for about one month; 2) having Hyland withhold information and reports required for the meeting; 3) gaining access to the steering report less than a week prior to the steering meeting; and 4) having to prepare 100 cases for the steering meeting in less than a week.

40. Customarily, IAB officers take vacation days after a steering meeting because of the intense workload necessary to prepare for the meeting.

41. On or about June 18, 2010, after the steering meeting was over, Hyland met with Gutierrez and his unit officers and ordered Gutierrez to cancel all his officers' vacation slips and to have them to re-present his/her cases to Hyland directly..

42. Gutierrez inquired Hyland as to why his unit was being singled out since his presentation has been praised by the chiefs.

43. After two weeks of reviewing Gutierrez's team's work, Hyland provided no feedback, determination, praise or reprimand to Gutierrez regarding his team's work. No other unit was ordered to cancel vacations or re-present cases to Hyland.

44. On or about July 8, 2010, Gutierrez learned that the investigating officer on the incident reported above in which the ADA decision not to file charges against an officer

that was being investigated, had broken protocol and delivered his investigation report regarding the incident directly to Hyland instead of to Gutierrez, stating "I did all the checks and now you in IAB cannot fuck with this guy."

45. As a result of this incident, Gutierrez was called to a meeting with Hyland, the investigating officer, and the investigating officer's union representative.

46. Although Hyland knew that Gutierrez was not aware of the investigating officer's actions, he threatened Gutierrez with a "failure to supervise" charge, which would have resulted in a loss of 30 vacation days and effectively block Gutierrez from further promotion.

47. Gutierrez explained that he had just learned of the incident and would discipline the investigating office for his breach of protocol.

48. In response, Hyland told Gutierrez not to discipline the officer, a white male, and withdrew his threat of discipline.

49. On or about July 14, 2010, after Gutierrez responded to a shooting in Washington Heights, Defendant Miller, a white male Inspector, showed up at the scene and told Gutierrez to stop sending information to headquarters downtown and to "run everything by [him] first."

50. Gutierrez inquired as to why he should stop sending his required reports, and Miller replied, "Yo bro, you don't know what the fuck you are doing. Everything you send downtown is bullshit."

51. After the crime scene was processed, Gutierrez and his team took their allotted dinner break. In the middle of the meal, Miller called Gutierrez demanding to know where he was, stating, "Yo bro, where are you."

52. After Gutierrez told Miller he was with his team having their meal break, Miller stated, "Yo bro, I didn't eat. I'm suspending your meal break" and ordered Gutierrez to return to the station immediately.

53. When Gutierrez arrived back at the station, he found that there was no immediate work to be done.

54. When questioned as to his reason for canceling Gutierrez's meal break, Miller said he wanted him to fax over the worksheets from the crime scene, a task ordinarily performed by an administrative worker.

55. Miller also said, "Yo bro, why is one of your officers working overtime?" referring to Officer Laureano, who was completing his investigative duties in accordance with normal protocol

56. After being insulted by Miller repeatedly, Gutierrez complained to Deputy Inspector O'Brien about Miller's demeaning racially motivated language towards him, i.e. "Yo bro" (he never spoke to white offices in this manner).

57. O'Brien told Miller to leave Gutierrez alone, but Miller continued to harass, discriminate and retaliate against Gutierrez.

58. On or about July 20, 2010, Gutierrez submitted his vacations request to Hyland, who approved it and sent it downtown where it was authorized.

59. From approximately July 26, 2010 through July 29, 2010, while on vacation, Gutierrez received several messages from Rodriguez stating that Hyland was demanding to know where Gutierrez was and if he was out of the country.

60. On or about July 28, 2010, Rodriguez left a message for Gutierrez stating that Hyland wanted to report Gutierrez Absent Without Leave (AWOL).

61. Gutierrez called Hyland and reminded him that he was on authorized vacation, which Hyland had approved.

62. On July 29, 2010, before Gutierrez returned from vacation, Diaz informed Gutierrez that he witnessed Hyland and Miller conducting an unauthorized search of Gutierrez's office that morning, going through Gutierrez's personal calendar, pictures of his family, as well as other personal items in his office.

63. Another officer on Gutierrez's team also reported that Hyland and Miller had conducted unauthorized searches of Gutierrez's office on at least two occasions while he was on vacation.

64. Additionally, Detective Glen told Gutierrez that he had witnessed the unauthorized search.

65. On August 19, 2010, Diaz called Gutierrez and informed him that Hyland and Miller were searching Gutierrez's office agenda, and while completing the search, they called Gutierrez "stupid," "idiot" and "incompetent," which was not only inappropriate but also in violation of NYPD protocol.

66. Upon information and belief, Miller and Hyland did not conduct searches of any of the white captains at IAB.

67. Shortly after this incident, Hyland cancelled Gutierrez's next vacation leave, which had already been approved.

68. According to Hyland, he cancelled it because he had decided to go on vacation at the same time and claimed that at least two captains should be in the office; in this case Gutierrez and Captain Corrado (white male).

69. However, shortly after Hyland pulled Gutierrez's request for vacation, he

approved Corrado's request for vacation, which was at the same time as Hyland's vacation.

70. On or about August 27, 2010, immediately after receiving a call to respond to an incident requiring an IAB investigation, Gutierrez received a call from Miller who stated, "Yo bro, are you there yet."

71. After Gutierrez completed his investigation, Corrado arrived at the scene and informed Gutierrez that Miller had ordered him to take over the investigation.

72. After seeing that the work at the scene had been completed, Corrado told Gutierrez, "I'm sorry. I don't why he (Miller) sent me here. There is nothing left to do."

73. Arriving back at the office, Gutierrez was informed that one of his officers would be receiving formal charges.

74. As is customary, Gutierrez contacted Miller to inform him of what was happening. Miller responded, "Yo bro, why are you fucking calling me? You handle it."

75. Gutierrez proceeded to contact headquarters and completed the customary processing of the formal charges.

76. That evening, Miller called Gutierrez, who was off duty, and demanded to know why Gutierrez sent the information downtown without giving it to him first, despite his earlier direction to "handle it."

77. In a rambling tirade that included racial insults, Miller told Gutierrez, "I'll suspend you if I want to bro. If I say so bro, you don't fucking move, you hear me mother fucker."

78. Miller continued, "I can't believe they made you a captain because you are fucking stupid, they're giving Hispanics promotions like candy."

79. Gutierrez responded, "You don't have the right to speak to me like that. If you call me when I am off duty and treat me like that again, I will have you arrested for harassment."

80. The same day, Gutierrez contacted NYPD's OEEO office, the in house office that handles discrimination complaints, and spoke to Sergeant Lewis to complain about the harassment by Miller and Hyland.

81. The OEEO officer told Gutierrez that he had to come in and file an official complaint.

82. Three days later, Corrado was ordered to review all of Gutierrez's cases.

83. Knowing this was an embarrassment for Gutierrez as a Captain, Corrado apologized, saying, "Bill, I'm sorry about this. I'm not part of this thing."

84. That same day Sergeant Howard told Gutierrez that he heard that Hyland and the senior white officers downtown wanted to keep Gutierrez out of further investigations.

85. Corrado confirmed this telling Gutierrez he that he had been ordered to take over Gutierrez's interviews.

86. Gutierrez called the OEEO officer and told her that clearly someone in her office had leaked the information regarding his complaint and, as a result, he was being retaliated against.

87. OEEO never addressed any of these retaliatory actions.

88. On or about August 31, 2010, Miller went into Gutierrez's office and, in a humble manner, stated, "You know, I apologize. It's not racial. I just don't feel comfortable with you."

89. On or about September 2, 2010, Hyland approached an officer on Gutierrez's

team and told him to deviate from protocol and leave an inspector off a notification form, which was being sent to headquarters.

90. Gutierrez received a call from an officer at headquarters who informed him that the inspector's name had been left off the list.

91. Gutierrez questioned Sergeant Choidi and Lieutenant Donovan regarding the incident and they informed him that Hyland had ordered them to keep the inspector out of the investigation.

92. Gutierrez told them to go back to Hyland and get an explanation for this action.

93. When they returned, they told Gutierrez that Hyland was now denying that he had ordered them to leave the inspector's name off the list. He then added the name to the list.

94. If the report had been filed without the name of the inspector, Gutierrez would have been subject to discipline for failing to include the name.

95. Since filing the OEEO complaint on August 27, 2010, as well as his EEOC Charge of Discrimination on October 7, 2010, Gutierrez has continued to experience increasing harassment, discrimination and retaliation by senior white officers, including but not limited to Miller and Hyland.

96. Miller and Hyland ordered the IAB investigation review section to review Gutierrez's cases on the following dates: September 13, 2010; September 21, 2010; October 8, 2010; October 15, 2010; and December 1, 2010.

97. These reviews were excessive and unwarranted with the real purpose being to harass and intimidate Gutierrez.

98. They are in addition to the internal kickbacks of Gutierrez's cases that began after

the OEEO complaint and include such negative comments "these cases are a disgrace" and "you are a disgrace to IAB."

99. Upon information and belief, none of the white captains have been treated in this manner.

100.    Additionally, the overtime of all of the officers that work under the supervision of Gutierrez was repeatedly scrutinized beginning in September 2010.

101.    During the same period, Captain Corrado's team (primarily white officers) was not subject to the same level of scrutiny for overtime and, in fact, Corrado's team was consistently provided with more resources than Gutierrez's team.

102.    In November 2010, Hyland assigned an investigation to Lt. Rodriguez without informing Gutierrez, a breach in NYPD policy.

103.    Hyland asked Rodriguez if he was related to the subject of the investigation because they are both from the Dominican Republic.

104.    He then stated to Rodriguez, "I know that you know this Dominican officer. He probably belongs to you and Captain Gutierrez's Dominican Society."

105.    In November 2010, Hyland became angry when the Chief of IAB requested direct help from Gutierrez and Rodriguez with a case involving the Dominican Republic and specifically left Hyland out of the investigation.

106.    Hyland stated in front of Gutierrez, "We are being taken over by the Dominicans."

107.    On December 7, 2010, Hyland called Gutierrez into his office to discuss the upcoming steering committee meeting on December 9, 2010.

108.    Hyland told Gutierrez that his lieutenants would not be presenting at the

steering committee meeting, and only Gutierrez would present to the Chiefs, which was odd because the lieutenants always present.

109.     Gutierrez objected because, as Hyland knew from attending the last steering meeting, the Chiefs had praised Gutierrez for the involvement of his lieutenants in the meeting, and they had told him that they wanted his lieutenants to continue to be involved in presentations at the steering meetings.

110.     Gutierrez reminded Hyland that the Chiefs wanted his lieutenants at steering meeting and accused Hyland of trying to set him up to fail.

111.     In response, Hyland threatened to suspend Gutierrez.

112.     Hyland also stated that he was going to change Gutierrez's team because it was "weak and wild" and that he and Inspector Scollan (white male) felt that Lt. Rodriguez's had a bad attitude because Gutierrez had giving him too much power in the unit.

113.     Decisions regarding personnel and the operation of units are made by the Captain in charge.

114.     Hyland did not question any of the white Captains' decisions regarding the operation of their units.

115.     On December 10, 2010, Captain Corrado took Gutierrez entire team without Gutierrez's permission or authority to conduct an operation on Staten Island. This left Gutierrez without enough personnel to conduct FSD duty.

116.     Since joining IAB, Gutierrez's white male superior officers, including but not limited to Hyland and Miller, have subjected him to the following based on his race and national origin: 1) harassing and demeaning Gutierrez in front of his subordinates; 2)

undermining his authority as a Captain by prohibiting Gutierrez from setting a flexible tour schedule, issuing overtime and approving vacation for his subordinate officers and 3) singling him out for stricter scrutiny of his cases.

## FIRST CLAIM AGAINST DEFENDANTS

*Violation of 42 U.S.C. § 1981*

117.    Gutierrez repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

118.    Defendants discriminated against Gutierrez based on his national origin, race and age with respect to the terms, conditions and privileges of his employment in violation of 42 U.S.C. §1981.

119.    Gutierrez is a Dominican male and as such is a member of a protected class.

120.    Gutierrez was treated differently because of his national origin and race than similarly situated white employees as a result of intentional and purposeful discrimination, as evidenced above.

121.    Gutierrez repeatedly reported incidents of impermissible discrimination against him to his superiors.

122.    Defendant NYPD knew or should have known of Hyland's and Miller's racist behavior and that of others directed at Gutierrez and failed to halt the unlawful conduct.

123.    As a result of defendants' intentional and unlawful actions, Gutierrez suffered damage to his reputation as a captain in the NYCPD, future promotions and emotional distress.

124.     Hyland and Miller's reckless, intentional and malicious actions warrant an award of punitive damages.

125.     As a direct and proximate cause of the hostile work environment endured by Gutierrez as a result of defendants' intentional and discriminatory conduct in violation of 42 U.S.C. §1981, Gutierrez has suffered and continues to suffer damages, including severe lasting embarrassment, humiliation and anguish, and is entitled to relief including consequential and incidental damages.

## SECOND CLAIM AGAINST DEFENDANTS

*Violation of 42 U.S.C. § 1983*

126.     Gutierrez repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

127.     Defendants, acting under color of state law, violated 42 U.S.C. §1983 by discriminating against Gutierrez on the basis of his national origin and race, and retaliating against Gutierrez for opposing impermissible discrimination, with respect to the terms, conditions and privileges of employment and by, including but not limited to: harassing and demeaning Gutierrez in front of his subordinates; 2) undermining his authority as a Captain by prohibiting Gutierrez from setting a flexible tour schedule, issuing overtime and approving vacation for his subordinate officers and 3) singling him out for stricter scrutiny of his cases.

128.     Gutierrez was treated differently because of his national origin and race than similarly situated white employees as a result of intentional and purposeful discrimination, as evidenced above.

129.     Gutierrez was treated differently because of his opposition to Hyland's

and Miller's blatant acts of discrimination.

130.    Gutierrez repeatedly reported incidents of impermissible discrimination to their superiors.

131.    Hyland's and Miller's numerous racist comments directed at Gutierrez, as well as their continuing harassment of Gutierrez, constitute a hostile working environment in violation of 42 U.S.C. §1983, as did the threats and intimidation Gutierrez suffered.

132.    The hostile work environment created by Defendants and their discrimination against Gutierrez resulted from a custom, policy, pattern or practice that was condoned by defendant NYCPD.

133.    Hyland's and Miller's statements and actions clearly violate established law prohibiting racial discrimination.

134.    As a direct and proximate cause of defendant's actions in violation of 42 U.S.C. §1983, Gutierrez has suffered and continues to suffer damages, including severe lasting embarrassment, humiliation and anguish, loss of reputation, as well loss of future promotional opportunities and is entitled to relief including consequential and incidental damages.

## THIRD CLAIM AGAINST DEFENDANTS

*Racial Discrimination, Harassment and Retaliation under the NYSHRL*

135.    Gutierrez repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

136.    The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment on the basis of an individual's race/national origin, and also

prohibits retaliation against individuals who, in good faith, complain about discriminatory practices to which they have been subjected.

144.     Defendants, as described above, discriminated against Gutierrez in violation of the NYCHRL by subjecting him to a hostile work environment, in the form of racial harassment that was severe or pervasive.

145.     Defendants retaliated against Gutierrez in violation of the NYCHRL for his actions in good faith of opposing and reporting Defendants' discriminatory practices by taking the various adverse employment actions described above against him.

146.     As a result of Defendants' discriminatory and retaliatory acts, Gutierrez has suffered and continues to suffer damages, including severe lasting embarrassment, humiliation and anguish, loss of reputation, as well loss of future promotional opportunities and is entitled to relief including consequential and incidental damages.

147.     Defendants Hyland and Miller directly participated in the discriminatory and retaliatory actions against Gutierrez described above.

148.     Defendants acted intentionally and with malice and reckless indifference to Gutierrez's rights under the NYCHRL and are thereby liable to Gutierrez for damages under the NYCHRL.

## FIFTH CLAIM AGAINST DEFENDANTS

### *Intentional Infliction of Emotional Distress*

149.     Gutierrez repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

150.     Defendants Hyland and Miller, by the actions described herein exhibited extreme and outrageous conduct.

151.    In undertaking the aforementioned actions, Defendant Hyland and Miller intended to cause Gutierrez severe emotional distress.

152.    The aforementioned conduct has caused Gutierrez severe emotional distress and mental anguish.

153.    As a proximate cause of Defendant's acts and omissions, Gutierrez has suffered and will suffer damages.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Gutierrez demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Gutierrez demands judgment against defendants as follows:

1. Enter a judgment declaring Defendants' patterns, practices and omissions, as described above, in violation of the law;

2. Enter a judgment and award in favor of Gutierrez and against Defendants for reasonable monetary damages and all other damages owed to Gutierrez in an amount proven at trial, resulting from Defendants' unlawful acts or omissions;

3. Enter a judgment and award in favor of Gutierrez for costs, including but not limited to reasonable attorneys' fees, expert witness fees, and other costs and expenses of this litigation;

4. Issue a permanent injunction barring Defendants, their agents, employees, officers and successors in interest, and those acting in concert with Defendants, from

engaging in illegal and the unlawful customs, policies and practices described above;

5. Directing that Defendants take such affirmative steps as are necessary to ensure the effects of these unlawful practices are eliminated;

6. Enter a judgment and award in favor of Gutierrez for pre-judgment interest;

7. Award such other and further legal and equitable relief as may be found to be just, proper and appropriate by this Court; and,

8. Retain jurisdiction over this action until such time as the Court is satisfied that Defendants have remedied the practices complained of and is determined to be in full compliance with the law.

Dated: Sea Cliff, New York
November 30, 2011

Respectfully Submitted,


By: _____
    JOADY BEJAMIN FEINER (JF 9766)
    JOADY BENJAMIN FEINER,
    ATTONREY AT LAW
    Attorneys for Gutierrez
    223 Glen Cove Avenue
    Sea Cliff, NY 11579
    Tel. (516) 319 – 5154
    Fax. (516) 209 – 3223

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

WILLIAM GUTIERREZ,

                              Gutierrez,

                    -against-

CITY OF NEW YORK, THE NEW YORK CITY POLICE          **VERIFICATION**
DEPARTMENT and MATTHEW HYLAND and RICK
MILLER in their Individual and Official Capacities,

                              Defendants.

-------------------------------------------------------------------X

STATE OF NEW YORK )
                        ) ss.:
COUNTY OF NASSAU )

          WILLIAM GUTIERREZ, being duly sworn, deposes and says that he the Plaintiff

in this proceeding, that he has read the Complaint and knows the contents thereof, that

the same is true to the knowledge of deponent except as to the matters therein stated to be

alleged upon information and belief, and as to those matters he believes to be true.

                                                WILLIAM GUTIERREZ

Sworn to before me this
30th day of November, 2011.

NOTARY PUBLIC

JOADY BENJAMIN FEINER
Notary Public, State of New York
No. 02FE6094740
Qualified in Nassau County
Commission Expires June 23, 20/5